IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES H. FOSTER et al.,

        Plaintiffs,

   v.

CITY OF PHILADELPHIA et al.,

        Defendants.

CIVIL ACTION
NO. 12-5851

**AMENDED OPINION**

**Slomsky, J.**                             **November 10, 2014**

TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................3

II.    PROCEDURAL HISTORY....................................................................................3

III.   FACTUAL STATEMENT .....................................................................................4

IV.   STANDARD OF REVIEW ..................................................................................15

V.    ANALYSIS...........................................................................................................16

    A.  Section 1983 Claims Against City Defendants, Jefferson, and Century Motors...16

        1. Section 1983 Claim Against Police Officer Sean Boyle .........................17

           i.     Foster Raises a Genuine Issue of Material Fact as to Whether
                 Officer Boyle's Seizures Were "Reasonable" Under the Fourth
                 Amendment...............................................................................17

           ii.    Officer Boyle Is Not Entitled to the Protection of Qualified
                 Immunity...................................................................................22

        2. Section 1983 Claim Against City of Philadelphia ...................................29

        3. Section 1983 Claim Against Jefferson....................................................32

           i.     Jefferson Is a State Actor ........................................................33

a.   Pre-Arranged Plan Between Jefferson and Boyle.............33

b.   Substitution of Judgment ....................................34

ii.   Jefferson Is Not Entitled to Qualified Immunity ..........................35

a.   Good Faith Affirmative Defense .......................................40

4. Section 1983 Claim Against Century Motors ...........................................41

i.   Century Motors Is a State Actor ....................................................41

ii.   Century Motors Is Not Entitled to Qualified Immunity................42

a.   Good Faith Affirmative Defense .......................................46

B.  Abuse of Process Claims Against City Defendants, Jefferson, and Century Motors .....................................................................................................................46

1. Abuse of Process Claim Against Jefferson ...............................................47

2. Abuse of Process Claims Against City Defendants .................................48

3. Abuse of Process Claim Against Century Motors ...................................48

C.  Conversion Claims Against City Defendants, Jefferson, and Century Motors .....................................................................................................................48

1. Conversion Claim Against Boyle ...............................................................49

2. Conversion Claim Against City of Philadelphia......................................52

3. Conversion Claim Against Jefferson ........................................................53

4. Conversion Claim Against Century Motors .............................................53

D.  Civil Conspiracy Claims Against City Defendants, Jefferson, and Century Motors ............................................................................................54

VI.   CONCLUSION.......................................................................................................56

## I.        INTRODUCTION

This case involves four claims alleging violations of federal and state law, all stemming from incidents that occurred at a vintage car restoration shop on May 16 and 23, 2011 in the Germantown section of Philadelphia.  Plaintiffs' claims include allegations of unreasonable seizures of vehicles and automobile parts, abuse of process, civil conspiracy, and conversion.  On August 4, 2014, after the close of fact discovery, Defendants filed Motions for Summary Judgment.  The Motions are now before the Court for disposition.

## II.       PROCEDURAL HISTORY

The parties in this lawsuit are Plaintiffs James H. Foster, West Johnson Garage, Inc. d/b/a West Johnson Classics, and International Collectibles, Inc. (collectively the "Foster Parties" or "Foster"); Defendant Alfred Jefferson ("Jefferson"); Defendants City of Philadelphia and Police Officer Sean Boyle ("City Defendants"); and Defendant Century Motors, Inc. ("Century" or "Century Motors").

In the Amended Complaint, the claims noted above are asserted against all Defendants in the following counts: (1) Count One – Unreasonable Seizure of Property in Violation of 42 U.S.C. § 1983; (2) Count Two – Abuse of Process; (3) Count Three – Conversion; and (4) Count Four – Civil Conspiracy.

On August 4, 2014, following a protracted period of motions practice, City Defendants, Century Motors, and Jefferson each filed separate Motions for Summary Judgment.  (Doc. Nos. 98-101.)  On September 3, 2014, Foster filed an Omnibus Response in Opposition.  (Doc. No. 100.)  Reply Briefs were also filed by Defendants.  (Doc. Nos. 102, 103, 112.)

For reasons that follow, the Court will grant in part and deny in part the City Defendants' and Century Motors' Motions for Summary Judgment, and will deny in its entirety the Motion for Summary Judgment filed by Jefferson.[1]

## III.   FACTUAL STATEMENT

The following facts are pertinent to the Motions for Summary Judgment and the Responses and are viewed in the light most favorable to Foster.[2]

This complex case emerges from what would seem to be a relatively routine problem: a landlord-tenant relationship gone awry.  From 1999 to 2010, Plaintiff James Foster, a longtime resident of Northwest Philadelphia and classic automobile enthusiast, leased garage space located at 86 West Johnson Street in Philadelphia from Defendant Alfred Jefferson.  (Doc. No. 100 at ¶ 7; Deposition of James Foster, Doc. No. 101, Ex. D at 24-26.)  At this garage, Foster had a classic automobile restoration business.  In addition to this business, Foster also owned and operated three local newspapers: *The Germantown Chronicle*, the *Northwest Independent*, and *The Independent Voice*.  (Doc. No. 100 at ¶ 5; Foster Dep. at 21-24.)

---

[1] On September 17, 2014, the Court was notified that a second case consolidated with this action, referred to as the "Banks" case (E.D. Pa. Civ. Action No. 13-2682) had been settled. Therefore, this Opinion only concerns summary judgment motions filed in this case, which the parties generally refer to as the "Foster" case.  In rendering this Opinion, the Court has considered the following: the Amended Complaint  (Doc. No. 6); City Defendants' Motion for Summary Judgment (Doc. No. 84); Century Motors' Motion for Summary Judgment (Doc. Nos. 85-86); Jefferson's Motion for Summary Judgment (Doc. No. 87); Foster's Response in Opposition (Doc. No. 100); Century Motors' Reply (Doc. No. 102); City Defendants' Reply (Doc. No. 103); Jefferson's Reply (Doc. No. 112); and all attached exhibits and related filings.

[2] In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)).  As the Foster Parties are the nonmoving parties here, the Court will view the facts presented in the light most favorable to them.

During his twelve year leasehold for use of the garage, Foster missed various rent payments owed to Jefferson, attributing these defaults to the ebb and flow of the classic automobile market. There were "periodic instances" in which he could not pay the rent on time, but he and Jefferson "regularly made arrangements to satisfy past due balances." (Doc. No. 100 at ¶¶ 11-12; Foster Dep. at 35-42, 47.)

Jefferson eventually took action to recover missed rent payments in 2009 and 2010.  (Doc. No. 100 at ¶¶ 13-15, 18; Doc. No. 101, Exs. G, H.)  His efforts culminated in two judgments against Foster.  (Id.)  In 2009, Jefferson received a judgment of delinquency against Foster, but did not evict him.  (Deposition of Alfred Jefferson, Doc. No. 101, Ex. L at 33:6-9.)  Thereafter, the parties reached an agreement over the judgment.  Foster executed a mortgage on his house in favor of Jefferson to satisfy the judgment which required Foster to pay Jefferson $1,095.71 per month.  (Foster Ex. G; Foster Dep. at 96-97; Jefferson Dep. at 32:3-9.)  Jefferson still holds that mortgage. (Jefferson Dep. at 33:2-3.)

On November 16, 2010, Jefferson filed a Landlord-Tenant Complaint against Foster in Philadelphia Municipal Court, again for unpaid rent.  (Doc. No. 101, Ex. H.)  Foster failed to answer the complaint, and the court entered a default judgment against him on December 17, 2011 in the amount of $9,500.[3]  (Doc. No. 101, Ex. I.)  Thereafter, on January 4 and January 21, 2011, in Philadelphia Municipal Court, Jefferson obtained a Writ of Possession/Eviction for the premises. (Doc. No. 87, Ex. G.)  On February 9, 2011, upon Jefferson's request, Foster and Jefferson met at 86 West Johnson Street, where a Sheriff served Foster with the Writ of Eviction. (Doc. No. 100 at ¶ 21; Doc. No. 87-1 at ¶ 19.)

---

[3] Foster claims that he was not properly served with the summons or complaint, causing the default judgment to be entered against him. (Doc. No. 100 at ¶ 16.)

Over the next few months, Jefferson allowed Foster limited access to the property so that he could remove vehicles and return them to their owners. (Doc. No. 100 at ¶ 24; Foster Dep. at 52-62.) Foster estimated that at various times between March 2011 and May 2011, he was able to retrieve around twelve of the forty-seven vehicles stored at the garage. (See Foster Dep. at 169:20-23.) Some vehicles were taken to another garage Foster used and others were retrieved by their owners. (Id. at 169-70; Doc No. 87, Ex. A at ¶ 23.) Thus, between February 9 and May 2011, Foster had removed some, but not all, of the vehicles from the premises.

In the midst of the eviction process, Foster published an article entitled "Trouble in Tascoland" in the April 29-May 11, 2011 edition of his newspaper *The Germantown Chronicle*. (Doc. No. 100 at ¶ 25-26; Doc. No. 101, Ex. K.) In the article, Foster criticized Philadelphia Councilwoman Marian Tasco, alleging that she misappropriated Deferred Retirement Option Plan ("DROP") retirement funds. [4] (Id.) Jefferson admitted in deposition testimony that he and Councilwoman Tasco maintain a personal relationship. (Doc. No. 100 at ¶¶ 27-29; Jefferson Dep. at 10-11.) Jefferson worked on and donated money to Tasco's campaign. (Doc. No. 100 at ¶¶ 28-29; Jefferson Dep. at 10-11; Doc. No. 101, Ex. M.) Additionally, Jefferson and Tasco attended social events together and Jefferson worked on Tasco's house. (Doc. No. 100 at ¶¶ 27-28; Jefferson Dep. at 10-13.) Within days of publishing this article, Foster was denied by Jefferson access to the Johnson Street garage, making it impossible for him to continue his efforts to remove vehicles. (Doc. No. 100 at ¶ 30; Foster Dep. at 60-61.)

In late April or early May 2011, Jefferson contacted the Pennsylvania Department of Transportation ("PennDOT") to obtain information about the procedure for removal of the vehicles from his property. (Doc. No. 87-1 at ¶ 28; Jefferson Dep. at 64:14-17.) PennDOT

---

[4] DROP was a controversial retirement program enacted for the benefit of employees of the City of Philadelphia.

referred him to the Philadelphia Police Department's Neighborhood Services Unit ("NSU").

(Doc. No. 87-1 at ¶ 29; Jefferson Dep. at 64:14-17; 96:2-9.)  Jefferson made a claim with the

NSU for removal of the vehicles from his garage.  (Doc. No. 87-1 at ¶ 31; Deposition of Officer

Sean Boyle, Doc. No. 101, Ex. N at 52:5-10.)  NSU is responsible for the removal of abandoned

vehicles under the Pennsylvania Abandoned Vehicle Code.  75 Pa.C.S.A. § 7301 et seq.

(hereinafter "the Code"). [5]

The definitional section of the Pennsylvania Vehicle Code, which includes the provisions of

the Abandoned Vehicle Code, defines an "abandoned vehicle" as follows:

> A vehicle (other than a pedalcycle) shall be presumed to be abandoned under any
> of the following circumstances, but the presumption is rebuttable by a
> preponderance of the evidence:
>
> (i)     The vehicle is physically inoperable and is left unattended on a highway or
>         other public property for more than 48 hours.
>
> (ii)    The vehicle has remained illegally on a highway or other public property
>         for a period of more than 48 hours.
>
> (iii)   The vehicle is left unattended on or along a highway or other public
>         property for more than 48 hours and does not bear all of the following:
>
>         (A) A valid registration plate.
>         (B) A current certificate of inspection.
>         (C) An ascertainable vehicle identification number.
>
> (iv)    The vehicle has remained on private property without the consent of the
>         owner or person in control of the property for more than 24 hours.

75 Pa.C.S.A. § 102.

---

[5]  Chapter 73 of the Pennsylvania Vehicle Code, which is contained in Title 75 of the
Pennsylvania Consolidated Statutes Annotated, is entitled "Abandoned Vehicles and Cargo."
Chapter 73 contains §§ 7301-7312 and is generally referred to by the parties as the
"Pennsylvania Abandoned Vehicle Code."

The Abandoned Vehicle Code, in addition to describing removal protocol for vehicles left on roadways, also sets forth specific protocol for handling reports by private property owners of abandoned vehicles.  75 Pa.C.S.A. § 7311.1, ("Reports by Private Property Owners of Abandoned Vehicles"), provides as follows:

> A person on whose private property is located a vehicle which has remained on the property without the consent of the property owner or his agent for more than 24 hours may authorize the removal or processing of the vehicle.  Prior to the removal or processing of the vehicle, that person shall file a report, on a multipart form prescribed by the department, with the local police department declaring that an unauthorized vehicle has been left unattended and on private property for at least 24 hours.  One part of such report shall be retained by that person, and the other part shall be filed with the police department.  The police department shall, within five business days, process the vehicle as abandoned under this chapter and attach a copy of the report to the abandoned vehicle information report.

75 Pa.C.S.A. § 7311.1.

Once a removal report is filed with NSU, a police officer from NSU will investigate to determine if removal is proper under the statute.  (Deposition of Mary Bibbo, Doc. No. 101, Ex. S at 43:9-19.)  After the investigation, if NSU determines that removal is warranted, NSU will designate a local business to remove and tow the vehicle at the pertinent address.  (See Doc. No. 84-2 at ¶¶ 27, 32.)  The local business is known as a "salvor" which would enter into a towing contract with the City of Philadelphia.[6]  75 Pa.C.S.A. § 102; (Doc. No. 86, Exs. R, T).

---

[6] Section 102 of the Motor Vehicle Code defines a salvor as a "person engaged in the business of acquiring abandoned vehicles for the purpose of taking apart, recycling, selling, rebuilding or exchanging the vehicles or parts thereof."  75 Pa.C.S.A. § 102.  The Motor Vehicle Code does not define what a "towing company" is although salvors could clearly engage in towing operations.  Id.  Section 7301(a.1) of the Abandoned Vehicle Code recognizes that there is a distinction between a salvage dealer and a towing business by providing as follows: "The department may authorize and issue a certificate of authorization to a currently registered repair or towing business under section 1337(c)(1) if there is no qualified vehicle salvage dealer in a county.  75 Pa. C.S.A. § 7301.

8

In this regard, the Code provides:

> Upon receipt of the written abandoned vehicle information report from any authorized person, . . . a salvor shall take possession of and remove to the storage facility of the salvor any abandoned vehicle located within 30 miles of the place of business of the salvor . . . .

75 Pa.C.S.A. § 7303.1(b).

The salvor will hold the vehicle for a length of time, and then dispose of it according to state law. (Doc. No. 86 at ¶ 22.)[7] NSU prepares the state mandated paperwork for every abandoned vehicle towed by the salvor and notifies the last registered owner or lienholder of the disposition of the vehicle. See 75 Pa.C.S.A. § 7305(a); (Doc. No. 86, Ex. R).

The City does not pay the salvor directly, but rather a salvor receives compensation from the owner of the vehicle for towing and storage charges.[8] 75 Pa.C.S.A. § 7306. If the salvor obtains a "certificate of salvage" or "salvage title" from the State, the salvor may keep the car and use or sell its parts.[9] See generally 75 Pa.C.S.A. §§ 7307-09; (Doc. No. 86, Ex. R); (Deposition of Richard Cray, Doc. No. 101, Ex. 17 at 42-45).

---

[7] Richard Cray, a general manager at Century Motors, testified in his deposition that vehicles are disposed of "according to by [sic] law by the State and what's mandated by the Philadelphia Police Department." Cray did not explain what is mandated by the Philadelphia Police Department. (Cray Dep. at 46:15-20.)

[8] For example, the contract between Century Motors and the City of Philadelphia provides: "The City of Philadelphia does not pay any salvor, nor does the City make any money for services rendered under this program. Any monetary earnings the salvor may gain that results from this contract are based solely from the salvage business." The contract also provides: "[i]n the event the owner or lien holder of an abandoned vehicle reclaims the vehicle, the fees charged by Salvor to the reclaiming party for towing and storage services shall not exceed One Hundred Dollars ($100.00) for each tow and Eleven Dollars and Fifty Cents ($11.50) per day for days 1 through 5; and, Seventeen Dollars and Twenty-Five Cents ($17.25) per day for days 6 through pickup." (Doc. No. 86, Ex. R at 1.)

[9] Cray testified that a salvor could keep an unclaimed vehicle by following one of two procedures, depending on the value of the vehicle. If the vehicle was worth less than $500, the salvor would send a form to the State and wait fifteen days before salvaging or "junking" the

Mary Bibbo, a civilian administrator at NSU, is in charge of facilitating the removal of vehicles that are deemed abandoned.  She selects the towing company for each assignment based on the one with the lowest number of year-to-date towing assignments.[10]  (Doc. No. 87-1 at ¶ 32; Bibbo Dep. at 52:3-4, 53:6-16, 60:3-61:13, 116:21-117.2.)  Before NSU commences a towing assignment of an abandoned vehicle, the owner of the property and the Philadelphia Police Officer assigned to verify the propriety of the towing operation, in accordance with State and Local law, must fill out a PennDOT form MV-952PP.[11]

Police Officer Sean Boyle, assigned to NSU, was designated to visit and inspect the 86 West Johnson Street garage and to investigate Jefferson's report.  He did so sometime before May 16, 2011.  (Boyle Dep. at 26-27, 31-32.)  Boyle verified through the Police Department that Alfred Jefferson was in fact the owner of the property.  (Doc. No. 84-2 at ¶ 11; Boyle Dep. at 33:19-25; Doc. No. 84, Ex. F.)  During the initial inspection, Jefferson gave Boyle the eviction notice. (Doc. No. 84-2 at ¶ 13; Jefferson Dep. at 65:22-25; Boyle Dep. at 32:14-19, 35:2-25.)

On May 16, 2011, Foster received a phone call from his wife, informing him that she witnessed a series of tow trucks lined up near the Johnson Street property.  (Foster Dep. at 155-

---

car.  (See Cray Dep. at 41-49.)  If the vehicle was worth more than $500, Century would send another form to the State and the State would notify the owner.  If the owner did not take action, the State required Century to advertise the car in a newspaper for public auction.  If the car did not sell at auction, Century could then obtain a certificate of salvage from the State and dispose of the vehicle. (Id.)

[10] The contract between Century Motors and the City of Philadelphia also provides: "City makes no guarantee or representation as to the number or location of abandoned vehicles to be assigned to Salvor and expressly reserves the right to obtain the services of such additional private salvors as may be deemed in the best interest in the City." (Doc. No. 86, Ex. R at 1.)

[11] The Philadelphia Police must also follow Directive 36, which supplements the Abandoned Vehicle Code and contains local procedures for handling abandoned vehicles.  (Doc. No. 84, Ex. H.)  In relevant part, the Directive defines an "abandoned" vehicle as one "that has remained on private property without the consent of the owner or person in control of the property for more than forty-eight (48) hours." (Id.)

56.)  Foster called Jefferson, who handed the phone over to Officer Boyle.  (Id. at 156.)  During

this call, Foster explained to Boyle that he ran a business out of the garage and that the cars

located there belonged to other people.  (Id. at 138:9-24, 139.)  Boyle responded that nothing

could be done to stop the vehicles from being towed.  (Id. at 155-56; Boyle Dep. at 62.)

Despite Foster's protests, eighteen vehicles were towed from the garage on May 16, 2011, all

belonging to third parties.  (Doc. No. 101, Ex. O.)  In addition to the vehicles, Boyle removed

loose automobile parts from the garage.  (Foster Dep. at 152; Cray Dep. at 101.)  Boyle did not

inventory these parts in writing nor did he try to match them with seized vehicles.  He did not

direct any person at NSU to inventory the parts or match them with the cars.  (Doc. No. 84-2 at

¶ 23.)

Vehicles and parts were towed to Century Motors, Inc., a Southwest Philadelphia-based

automotive repair and car part business which was a designated salvor that had a contract with

the City of Philadelphia.  (Doc. No. 100 at ¶ 55; Foster Dep. at 142-54.)  Richard Cray, a

Century Motors employee and a former Highway Sergeant for the Philadelphia Police,

coordinated the May 16, 2011 towings on Century's behalf.  (Doc. No. 100 at ¶ 67; see Cray

Dep. at 93-117.)  When third-party car owners went to Century to pick up their vehicles, they

observed that their cars were damaged and parts were missing.  (Doc. No. 100 at ¶¶ 79-80.)  One

owner, John Bank, claimed that Cray was "aggressive and profane with Bank" and "intimidated

Bank into signing a waiver for any damage to the vehicle."  (Id. at ¶ 80; Deposition of John

Bank, Doc. No. 101, Ex. CC at 28-29.)

After the towing, Foster called the Internal Affairs Bureau ("IAB") of the Philadelphia Police

Department and spoke with Lieutenant Kevin Long, who was an acquaintance of Foster.  (Doc.

No. 100 at ¶ 52; Foster Dep. at 142, 193-95.)  Long told Foster that he was shocked about the

bizarre operation of the towing of the vehicles by NSU, and that Internal Affairs would

investigate the incident.  (Doc No. 100 at ¶ 53; Foster Dep. at 142.)  That same day, Foster went

to the NSU building, where he spoke with Mary Bibbo, the civilian administrator, and Captain

Anthony Desher, the person in charge of the unit involved in towing abandoned vehicles.  (Doc.

No. 100 at ¶ 54; Foster Dep. at 142-54.)  Foster explained what happened, prompting Desher to

respond, "Century's gotta get something out of this, end of story."  (Doc. No. 100 at ¶ 56; Foster

Dep. at 154.)

On or about May 17, 2011, Lieutenant Long and Foster had another conversation, where

Long told Foster: "Get yourself a good lawyer, the decision to take your cars came from the

highest level of the department."  (Doc. No. 100 at ¶ 57; Foster Dep. at 154.)

In addition to his conversations with Foster, Long communicated within the Police

Department about the towing incidents at 86 West Johnson Street.  On May 26, 2011, Long sent

an email to Captain Desher, which read in relevant part:

> Captain Desher,
>
> Thank you for taking my call today in reference to the assignment at 86 West
> Johnson Street. This is a rather unique situation and I hope that your contacting
> the evicted tenant, Jim Foster, will help minimize the need for a formal
> investigation at IAB.

(Doc. No. 101, Ex. V.)

On May 23, 2011, Boyle and NSU conducted a second round of towing from the 86 West

Johnson garage, taking another seventeen vehicles.  (Doc. No. 100 at ¶¶ 38, 39; Foster Dep. at

82; Doc. No. 101, Ex. R.)  This time, each vehicle belonged to Foster.  (Id.)  They were towed to

Steffa Metals, Co., a car parts business located in Northeast Philadelphia.  (Doc. No. 100 at ¶¶

38, 39; Doc. No. 101, Ex. Q.)  Overall, "[t]he collaboration between Boyle and Jefferson

consisted of at least three in-person meetings, the completion of the PennDOT MV952-PP forms,

several telephone conversations and two full-day towing sessions," resulting in a total of thirty-five vehicles being towed.  (Doc. No. 100 at 18; <u>see</u> Boyle Dep. at 26-33, 37-40, 72-73.)

Regarding the May 16 and May 23 towings, Boyle and Bibbo acknowledged that the vehicles towed from the garage were related to the landlord-tenant dispute between Foster and Jefferson.  (Boyle Dep. at 65; Bibbo Dep. at 49.)  Boyle testified that he knew that the garage housed Foster's business, and acknowledged that the premises had a business license on the wall, an engine hoist, and a jack.  (Boyle Dep. at 38-39.)  He also observed automobile parts throughout the garage.  (<u>Id.</u>)  Further, Boyle testified that Foster informed both Boyle and Jefferson on May 16, 2011 that the vehicles being towed did not belong to Foster and that he needed to return them to their owners.  (Boyle Dep. at 41-43; Jefferson Dep. at 45-46.)

In his deposition, Captain Desher, from his eight years of experience in the towing unit, could single out only one other instance where the Police towed a high volume of vehicles from a garage.  (Deposition of Captain Anthony Desher, Doc. No. 101, Ex. W at 22, 29.)  He was unsure whether the garage in the previous incident was an automotive business.  (<u>Id.</u>)  Similarly, Boyle, who has been involved in the towing of thousands of cars in his position at NSU, could not name another instance in which vehicles were towed from a closed garage or automotive business.  (<u>See</u> Boyle Dep. at 83, 87.)  Bibbo likewise testified that in her fourteen years at NSU, she has never heard of another instance in which such a high number of vehicles were towed from a private garage.  (<u>See</u> Bibbo Dep. at 49.)  In fact, these individuals recognized that this was a unique situation and instituted special procedures for the May 16 towing.  (Doc. No. 86 at ¶ 58.)  Bibbo worked to ensure that the owners of the towed vehicles did not receive citations or incur towing or storage fees from Century Motors.  (<u>Id.</u>; Bibbo Dep. at 48-51; Boyle Dep. at 71.)

Based on his conversations with Lieutenant Long, Foster became suspicious of Century Motors and began to research their business.  (See Doc. No. 100 at ¶¶ 62-63.)  Subsequent investigation revealed the following about Century Motors and the Philadelphia Police Department.

First, the Federal Bureau of Investigation ("FBI") was investigating Century Motors for improper activities.  (Doc. No. 100 at ¶ 63; Foster Dep. at 259; Cray Dep. at 74-77.)  Boyle and Bibbo acknowledged in their depositions that they were aware of the investigation and that it was still ongoing.  (Boyle Dep. at 84-86; Bibbo Dep. at 152-53.)  In or around January 2011, approximately fifteen FBI agents raided Century Motors' office and seized the company's computers.  (Cray Dep. at 74-78.)

Second, former Philadelphia Police Highway Patrol Officer Richard Cray worked as a general manager of Century Motors, and was present during the May 16 and May 23 towings.  (Cray Dep. at 23-25; Doc. No. 86, Ex. R.)  Cray began working at Century in 1995, and worked concurrently at Century and the Police Department until 2004, when he retired from the Police Department and then worked exclusively at Century.  (Cray Dep. at 23-25.)  At Century, Cray was involved in coordinating the towing of abandoned vehicles under the Code.  (Id. at 25.)  Cray left Century Motors in 2012.  (Doc. No. 100 at ¶ 72; Cray Dep. at 53-55.)

During his employment at Century, Cray was familiar to many people in the Police Department.  Bibbo testified: "I mean, everybody at our unit knew Richie Cray because he was a highway sergeant."  (Bibbo Dep. at 154-55.)  Cray even wrote Bibbo a personal, handwritten note requesting information regarding paperwork reflecting the values of the towed vehicles.  (Doc. No. 100 at ¶ 77; Bibbo Dep. at 196:10-16; Doc. No. Ex. AA.)  The note read: "can we redo 952's w/ value –Richie."  (Id.)  When asked about this note, Bibbo testified that she interpreted

14

the note to mean that Cray requested guidance from Bibbo regarding "cars that didn't have value that he wanted value put on them." (Bibbo Dep. at 196.) In effect, Cray was asking Bibbo to redo forms to show a value on certain cars.

As a result of the May 16 and May 23 towings, Foster was unable to operate his business. He sustained a loss of income and business opportunities. (Doc. No. 100 at ¶¶ 85-89; Foster Dep. at 109, 188-89.) Moreover, Steffa Metals has not returned Foster's personal vehicles towed on May 23, 2011. (Doc. No. 100 at ¶ 88; Doc. No. 101, Ex. R.) Foster estimates the value of his vehicles to be $66,630. (Doc. No. 100 at ¶¶ 85-89; Foster Dep. at 109, 188-89.) Foster also testified that the towings were a public spectacle and caused him pain, suffering, humiliation, emotional distress, and loss of reputation in his community. (Doc. No. 100 at ¶ 89; Foster Dep. at 109, 188-89.)

## IV.   STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (quotation omitted)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. Once the proponent of summary judgment "points to

15

evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216 (internal quotation marks omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009) (quotation omitted)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247-49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## V.    ANALYSIS

### A.    Section 1983 Claims Against City Defendants, Jefferson, and Century Motors

In opposing the Motions for Summary Judgment, Foster alleges that the evidence shows at this stage of the proceedings that City Defendants, Jefferson, and Century Motors acted under color of state law when they conspired to remove and seize vehicles from the garage located at 86 West Johnson Street.  He also claims that the removal constituted an illegal seizure under the Fourth and Fourteenth Amendments.

To establish a claim under § 1983, a plaintiff (1) must establish a violation of a constitutional right, and (2) show that the alleged violation was committed by a person acting under color of

state law.  Boyer v. Mohring, 994 F. Supp. 2d 649, 657 (E.D. Pa. 2014) (citing West v. Atkins, 487 U.S. 42, 48 (1988)).

Accordingly, the Court will discuss the Motions for Summary Judgment on the § 1983 claim against each defendant in the following order: Officer Boyle, City of Philadelphia, Jefferson, and Century Motors.

### 1.        Section 1983 Claim Against Police Officer Sean Boyle

Officer Boyle contends that his authorization to tow Foster's vehicles did not amount to an unreasonable seizure in violation of the Fourth and Fourteenth Amendments. [12]  (Doc. No. 84-1 at 6-7.)  Alternatively, Boyle argues that even if his actions led to an unreasonable seizure, he should be afforded the protection of qualified immunity.  (Id. at 7.)

For reasons set forth below, summary judgment as to Boyle will be denied on Count One because Foster has raised a genuine issue of material fact as to (1) whether the towing or seizure of the vehicles was "reasonable" under the Fourth and Fourteenth Amendments, and (2) whether qualified immunity shields Boyle from suit for his conduct in this case.

### i.        Foster Raises a Genuine Issue of Material Fact as to Whether Officer Boyle's Seizures Were "Reasonable" Under the Fourth Amendment

"The impoundment of an automobile is a Fourth Amendment seizure."  Draper v. Upper Darby Twp. Police Dept., No. 10-1080, 2012 WL 93178, at *2 (E.D. Pa. Jan. 11, 2012).  "As a general rule, a law enforcement officer may only seize property pursuant to a warrant based on probable cause.  Police may, however, exercise discretion to impound a vehicle so long as that discretion is exercised according to standard criteria."  Id. (internal quotation marks omitted).  However, a decision to impound a vehicle contrary to standardized procedure is not a per se

---

[12] As noted, one element of a § 1983 claim is that a defendant is a state actor.  City Defendants do not contest that Officer Boyle and the City of Philadelphia are state actors.

violation of the Fourth Amendment.  See United States v. Smith, 522 F.3d 305, 312 (3d Cir. 2008).

The crux of whether the Fourth Amendment was violated, however, depends on the objective reasonableness of the seizure.  See Smith, 522 F.3d at 312.  The reasonableness inquiry requires consideration of the circumstances of each individual situation.  See Cooper v. California, 386 U.S. 58, 59 (1967).

Boyle argues that his conduct was reasonable because he was merely following the protocol for the handling of vehicles left on private property without the consent of the owner for over twenty-four hours pursuant to Pennsylvania's Abandoned Vehicle Code.  75 Pa.C.S.A. §§ 7303.1, 7311.1; (Doc. No. 84-1 at 9).[13]  In accordance with the Code, Boyle claims that because he verified that (1) Jefferson was the owner of the property, (2) Foster was properly evicted from this property, and (3) the towed vehicles were on the premises for over twenty-four hours, he acted reasonably in removing the vehicles.  (Id.)

---

[13] Boyle alleges that his actions in the May 16 and 23 towings were pursuant to § 7311.1 of the Abandoned Vehicle Code, set forth above, which describes the duties of police and private parties when removing a vehicle from private property.  75 Pa.C.S.A. § 7311.1.  This section of the Code does not mention the rebuttable presumption when a vehicle is processed as "abandoned" that appears in the definition of "abandoned vehicle" in § 102 of the general Pennsylvania Vehicle Code, also set forth above.  75 Pa.C.S.A. § 102.  Because § 7311.1 is contained in the Abandoned Vehicle Code, and does refer in its text to the term "abandoned" in conjunction with the processing of a vehicle, a clear reading of both § 7311.1 and the definition set forth in § 102 of the Vehicle Code together would indicate that the presumption that a vehicle remaining in private property without the consent of the owner for more than twenty-four hours is abandoned and can be rebutted by a preponderance of the evidence would apply to § 7311.1.  Application of the Pennsylvania rules of statutory construction supports this conclusion: "[T]he General Assembly intends the entire statute to be effective and certain."  1 Pa.C.S.A. § 1922(2).  This is a presumption that is used in ascertaining legislative intent.  Id.  There is no indication that the legislature attempted to eliminate from any section of the Abandoned Vehicle Code the presumption that appears in the definition of "abandoned vehicle" or the fact that the presumption can be rebutted by a preponderance of the evidence.

This analysis is not entirely accurate given that this case involves a matter of federal law. "The question . . . upon review of a state-approved . . . seizure is not whether [the seizure] was authorized by state law but whether [the seizure] was reasonable under the Fourth Amendment." Miranda v. City of Cornelius, 429 F.3d 858, 864-65 (9th Cir. 2005) (citing Sibron v. New York, 392 U.S. 40, 61 (1968)).

Here, viewing the evidence in the light most favorable to Foster, he raises a genuine issue of material fact regarding what a "reasonable" response to Jefferson's request that the vehicles be removed from the garage should have been under the Code and, by extension, under the Fourth Amendment. (Doc. No. 100 at 20.)

Initially, Foster claims that the evidence shows that Boyle's seizure was illegal under the Code for two reasons: (1) Boyle was not acting reasonably in believing the vehicles were "abandoned," and (2) the Abandoned Vehicle Code does not authorize the seizure of loose car parts. (Doc. No. 100 at ¶ 51.) The Court will address these assertions in turn.

First, as noted previously, the Vehicle Code specifically defines the term "abandoned vehicle:"

> A vehicle (other than a pedalcycle) shall be presumed to be abandoned under any of the following circumstances, *but the presumption is rebuttable by a preponderance of the evidence*:
>
> (i)     The vehicle is physically inoperable and is left unattended on a highway or other public property for more than 48 hours.
>
> (ii)    The vehicle has remained illegally on a highway or other public property for a period of more than 48 hours.
>
> (iii)   The vehicle is left unattended on or along a highway or other public property for more than 48 hours and does not bear all of the following:
>
>         (A) A valid registration plate.
>         (B) A current certificate of inspection.
>         (C) An ascertainable vehicle identification number.

19

(iv)    The vehicle has remained on private property without the consent of the owner or person in control of the property for more than 24 hours.

75 Pa. C.S.A. § 102 (emphasis added).

In this case, accepting the facts favoring Foster as true, he has rebutted the presumption that the vehicles were abandoned in accordance with subsection four (iv) by a preponderance of the evidence.

Officer Boyle testified that the premises showed signs of an operating business: he noticed a business license on the wall, an engine hoist, a jack, and automobile parts throughout the garage. (Doc. No. 100 at 21; Boyle Dep. at 38-39.)  Despite these observations, Boyle continued with the towing procedure knowing that a party used the premises as a repair shop. (Doc. No. 100 at 21; Boyle Dep. at 41-43; Jefferson Dep. at 45-46.)  At some point, he spoke to Foster on the telephone and learned that Foster operated a car business from the garage.  Foster told him that he ran a business out of the garage and that cars located there belonged to other people.  (Foster Dep. at 139.)  Boyle also testified that he removed the cars simply because Jefferson wanted them to be removed, and despite Foster's direct protests that the vehicles were not abandoned. (See Boyle Dep. at 65:16-19.)  Furthermore, Boyle himself had never before removed a vehicle from a private automotive business, and could not recall an instance where he removed multiple vehicles at once from a garage.  (See id. at 65, 83-84.)  The rare nature of the actions of Boyle and NSU were confirmed by Administrator Bibbo and Captain Desher.  (See, e.g., Bibbo Dep. at 49; Desher Dep. at 22, 29.)

Given these circumstances, Boyle's reliance on the Abandoned Vehicle Code to support the propriety of classifying these vehicles as "abandoned" is suspect because Foster has submitted evidence rebutting the presumption that the vehicles were abandoned by a preponderance of the

evidence.  Thus, Foster has raised a genuine issue of material fact of whether the seizures were reasonable.  Boyle's reliance on the Abandoned Vehicle Code may be a defense at trial, but does not warrant relief at the summary judgment stage because the reasonableness of the seizures is in question.[14]

Foster also raises another genuine issue of material fact in regard to whether seizure of the parts from the garage was improper under the Abandoned Vehicle Code.  (Doc. No. 100 at 22.) He argues that the Code does not contain language authorizing the towing or seizure of loose automobile parts, and asserts that Boyle made no effort to match the parts with the vehicles, and did not report or document the towed parts to NSU.  (Id. at 22; Boyle Dep. at 105.)  Foster is correct that neither the definition of "abandoned vehicle" in the Vehicle Code nor any language in the Abandoned Vehicle Code authorizes the seizure of car parts.  Thus, the fact that Boyle did not inventory the parts raises an inference that he knew he was not authorized to seize them

---

[14] Few cases address specific factors a police officer should consider in determining whether a vehicle is abandoned.  However, Mays v. Scranton City Police Dep't, provides some guidance. 503 F. Supp. 1255 (M.D. Pa. 1980).  Mays addressed subpart (iii) of the definition of abandoned vehicle, which covers unattended vehicles on a highway or other public space.  The Court noted the following factors:

> Relevant factors would be the physical condition of the vehicle, the area in which it had been left, and the length of time it had remained parked in the same location.  In addition, it would appear that the officer would have to consider whether under the circumstances the vehicle posed a threat to public safety or health.

Id. at 1262.  While in Mays the Court posed these factors as being relevant for consideration under subpart (iii), they are instructive for police officers in any situation in determining whether a vehicle is abandoned under the Code.  Applying them here where vehicles being seized have remained in a private garage for some length of time with no threat to public safety or health, would lend further support to Foster's claim that the seizures were unreasonable.

under the Code.  Consequently, the reasonableness of the seizure of the parts is a genuine issue

of material fact for the jury to consider. [15]

Thus, the evidence submitted on the Motions for Summary Judgment shows that Boyle did

not act in objective, good faith reliance on the Pennsylvania Vehicle Code and the Abandoned

Vehicle Code because a reasonably well-trained officer, with a reasonable knowledge of what

the law prohibits, would have known that his actions violated Pennsylvania law and the Fourth

and Fourteenth Amendments.

> ### ii.      Officer Boyle Is Not Entitled to the Protection of Qualified Immunity

Next, Boyle argues that even if a jury could reasonably find him liable for an unreasonable

seizure under the Fourth Amendment, he is nonetheless entitled to qualified immunity.  (Doc.

No. 84-1 at 10.)

Qualified immunity "protects government officials from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  The law

regarding qualified immunity is well established:

> To determine whether an officer is qualifiedly immune from suit, we ask (1)
> whether the officer violated a constitutional right, and (2) whether the right was
> clearly established, such that "it would [have been] clear to a reasonable officer
> that his conduct was unlawful in the situation he confronted."  Saucier v. Katz,
> 533 U.S. 194, 201-02 (2001); see also Anderson v. Creighton, 483 U.S. 635, 640
> (1987) (holding that, for purposes of the second question, the right must have
> been clearly established in a particularized sense, such that "a reasonable official
> would [have understood] that what he [wa]s doing violate[d] that right").

---

[15] As noted in the earlier recitation of the facts and in the discussion to follow, Foster has
produced evidence of an inference of collusion between Century Motors and employees of the
NSU.  Evidence of improper collusion also affects the reasonableness of the seizure and may
be considered by a jury for this purpose.

Wray v. Painter, 791 F. Supp. 2d 419, 426-27 (E.D. Pa. 2011) (citing Lamont v. New Jersey, 637 F.3d 177, 182 (3d Cir. 2011)).  "While the issue of qualified immunity is generally a question of law, . . . a genuine issue of material fact will preclude summary judgment on qualified immunity."  Barkes v. First Correctional Medical, Inc., No. 12-3074, 2014 WL 4401051, at *18 (3d. Cir. Sept. 5, 2014) (citing Deary v. Three Un-Named Police Officers, 746 F.2d 185, 192 (3d. Cir. 1984)) (internal quotation marks omitted).

The first prong of the qualified immunity analysis requires the Court to determine whether there has been a constitutional violation.  If Foster had failed to produce sufficient evidence on which a reasonable jury could find a constitutional violation, then summary judgment would be appropriate because Boyle would have been entitled to qualified immunity as a matter of law.  See Wray, 791 F. Supp. 2d at 426 (quoting Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002)).  Foster, however, has met his burden at the summary judgment stage to establish a Fourth and Fourteenth Amendment violation.  As discussed above, Foster has raised a genuine issue of material fact as to whether the seizures were unreasonable.  Thus, a jury ultimately must determine whether a constitutional violation has occurred here.

Under the second prong of the qualified immunity test, the Court must decide whether Boyle violated a clearly established right.  Gale v. Sorti, 608 F. Supp. 2d 629, 634 (E.D. Pa. 2009); see also Walden v. Borough of Upper Darby, 77 F. Supp. 2d 655, 657 (E.D. Pa. 1999) ("The existence of a clearly established right is a question of law which a district court should decide.").  If the Court deems the right in question to be clearly established, it must analyze whether the government official "acted reasonably in depriving the plaintiff of this clearly established right."  Gale, 608 F. Supp. 2d at 634.

In engaging in this analysis, a court must be mindful that the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (internal quotation marks omitted). Whether or not the officers made a reasonable mistake as to what the law requires mandates an inquiry into all factual circumstances surrounding the seizure itself. Gale, 608 F. Supp. 2d at 634.

In this case, however, Foster has presented sufficient evidence to show that Boyle did not make a reasonable mistake, but intentionally acted unreasonably in seizing the vehicles and parts. Because of the rebuttable presumption in the Vehicle Code, Boyle's actions were not consistent with Pennsylvania law. See 75 Pa.C.S.A. § 102. Reviewing the evidence in the light most favorable to Foster, Boyle was on notice that he was authorizing an illegal seizure. In this regard, a further discussion of the facts is appropriate in the context of the qualified immunity claim made by Boyle.

First, the property he seized was not contraband, but allegedly abandoned property under the Pennsylvania Abandoned Vehicle Code. Although he had the right to seize the property after twenty-four hours (or forty-eight hours under local procedures), he ignored objective evidence that would rebut the presumption that the vehicles in question were abandoned. As noted, the facts show that there were numerous vehicles inside the garage along with various parts and signs posted on the wall. (Boyle Dep. at 38-39.) He even spoke to Foster while on the premises who informed him in effect that the cars were not abandoned. (Id. at 41-43.)

Second, the Abandoned Vehicle Code does not refer to car parts as removable items under its provisions. See Pa. C.S.A § 7301 et seq. Although an officer might assume that the parts were covered by the Abandoned Vehicle Code, the presence of the parts and the other indicia on the

premises, as noted above, would put him on notice that this garage was an operating business and not one abandoned by the owner with no interest in the parts.

Third, Boyle never inventoried in writing the seized parts.  (Doc. No. 84-2 at ¶ 23.)  He was aware that FBI agents were investigating Century Motors.  (Boyle Dep. at 85-86.)  His failure to document the parts while having knowledge of the FBI investigation raises an inference that his motive in seizing the parts and turning them over to Century Motors may have been for an improper purpose.

Fourth, Foster produced evidence that a questionable relationship may have existed between Century Motors and NSU through their ties with retired Highway Sergeant Richard Cray, who was employed at Century Motors at the time of the towing and coordinated the May 16, 2011 towing for Century.  For nine years, Cray worked simultaneously at the Philadelphia Police Department and Century Motors.  (Doc. No. 100 at ¶ 67; Cray Dep. at 11-12, 28-30.)  During this time, Cray was well known by his co-workers.  Bibbo, the civilian administrator at NSU, testified that everyone in her unit knew Cray because he was a police officer.  As noted above, Cray wrote Bibbo a personal handwritten note regarding paperwork about the value of the vehicles towed on May 16, which raises an inference that the vehicles were given to Century for resale rather than to return them to their rightful owners.  (Doc. No. 100 at ¶ 77; Cray Dep. at 127; Doc. No. 101, Ex. AA.)

In some ways, what occurred here is analogous to what occurred in <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248 (3d Cir. 2010).  In <u>Kelly</u>, a vehicle passenger filmed a traffic stop and was subsequently arrested by the recorded officer who confiscated the camera.  Before arresting the defendant for what the officer believed was a violation of the Pennsylvania Wiretap Act, the officer called an Assistant District Attorney who, based on the facts as described by the officer,

advised that he believed that defendant violated the Wiretap Act. The defendant was thereafter arrested and charged. The charges against him were eventually dropped and the defendant sued the officer and the Borough of Carlisle under 42 U.S.C. § 1983 alleging violations of the First and Fourth Amendment. Id. at 251-52.

On the Fourth Amendment claim, the District Court judge granted summary judgment to the officer based on qualified immunity, because he relied in good faith on the legal opinion of the Assistant District Attorney. The Court of Appeals reversed. Recognizing that this case was one of first impression as to whether the police officer's reliance on legal advice cloaks him with the protection of qualified immunity, the Third Circuit held that:

> [A] police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on lack of probable cause. That reliance must itself be objectively reasonable, however, because a "wave of the prosecutor's wand cannot magically transform an unreasonable probable cause determination into a reasonable one." Accordingly, a plaintiff may rebut this presumption by showing that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice.

Id. at 255-56 (quoting Cox v. Hainey, 391 F.3d 25, 34 (1st Cir. 2004)).

In view of this holding, the Court of Appeals remanded the case to the District Court for reconsideration of the grant of qualified immunity on the Fourth Amendment claim. The Court of Appeals found that the District Court essentially did not evaluate the objective reasonableness of the officer's decision to rely on the advice of the Assistant District Attorney, and did not sufficiently evaluate the state of Pennsylvania law on the Wiretap Act at the relevant time.

On the First Amendment claim, however, the Court of Appeals held that the defendant was entitled to qualified immunity because there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on "fair

notice" that seizing a camera or arresting an individual for videotaping police during the stop

would violate the First Amendment.  In analyzing the First Amendment claim, the Court

interestingly noted:

> In determining whether a right is clearly established, it is not necessary that the exact set of factual circumstances has been considered previously.  Hope v. Pelzer, 536 U.S. 730, 739 (2002) (being "clearly established" does not require that "the very action in question has previously been held unlawful").  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances," id. at 741, as long as the law gave the defendant officer "fair warning" that his conduct was unconstitutional.

Id. at 259-60.[16]

The Court of Appeals reinforced this reasoning in Barkes v. First Correctional Medical, Inc.,

once more rejecting the notion that a shortage of relevant case law is tantamount to not "clearly

established" for purposes of qualified immunity.  2014 WL 4401061, at *16.  In this case, an

inmate committed suicide while in state custody.  Id.  The medical care provider for the prison,

in charge of monitoring the inmate, was a privately-owned third-party company.  Id.  The

inmate's family sued the prison under § 1983 on the theory that the inmate had a right to

"supervision of the medical vendor by the prison administrators." Id.  The prison asserted that

the right was not clearly established because there was no case law establishing that a

government entity is responsible for such monitoring.  Id.  The Court of Appeals held that the

prison's "myopia runs directly contrary to the Supreme Court's oft-repeated admonition that 'a

case directly on point' is not required for a right to be clearly established."  Id. (citing Ashcroft v.

al-Kidd, 131 S. Ct. 2074, 2083 (2011)).

---

[16] Similarly, Draper v. Darby Twp. Police Dep't, held that "a right may be 'clearly established' where there is some but not precise factual correspondence between relevant precedents and the conduct at issue." No. 10-1080, 2012 WL 93178, at *2 (E.D. Pa. Jan. 11, 2012) (quoting McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001) (internal quotation marks omitted).

Boyle makes the same failed argument in this case, claiming that "there is no decisional law or statute that would have put [Officer] Boyle on notice that removing unauthorized cars at Mr. Jefferson's request from Mr. Jefferson's property would be a violation of the Fourth Amendment." (Doc. No. 84 at 10.)  However, this argument fails on its face because, as discussed above, the absence of case law is not equivalent to not "clearly established;" and furthermore, the Abandoned Vehicle Code itself is a statute that provided Boyle with notice.

If Boyle relied on the definition of "abandoned vehicle" in the Vehicle Code and the provisions of the Abandoned Vehicle Code in seizing the vehicles, it must be assumed that he read them and knew about the rebuttable presumption contained in the definition of "abandoned vehicle."  75 Pa.C.S.A. § 102.  Under the novel factual circumstances here, the rebuttable presumption in the definition of "abandoned vehicle" gave him, as a competently trained officer, "fair warning" that his conduct may be in violation of the Abandoned Vehicle Code and even amount to an illegal seizure under the Fourth Amendment.  Moreover, it is clearly established under the Code that only abandoned vehicles can be removed.

Thus, despite a dearth of case law discussing the contours of what would be a reasonable seizure of a vehicle in a private garage under the Code, the Vehicle Code clearly defines what is an abandoned vehicle with the caveat of the rebuttable presumption.  75 Pa.C.S.A. § 102.  Further, the Abandoned Vehicle Code sets forth the procedures for the removal of abandoned vehicles.  Among its provisions, the Code describes the general duties of the Police Department and salvors (§ 7303.1); provides a concise roadmap of the reporting and removal procedures (§ 7304.1, § 7311.1); details notice requirements (§ 7305); and specifies how and when unclaimed vehicles can be disposed of or sold (§§ 7307-09).  75 Pa.C.S.A. § 7301 et seq.  But before these procedures are implemented, Boyle had to make a determination that the vehicles

were abandoned.  Hanging over Boyle's claim that he did not have "fair notice" is the rebuttable presumption, which he evidently ignored in his decision-making despite clear evidence to put him on notice that his reliance on the Code was unreasonable.  Like the defendant in <u>Kelly</u>, who could not "wave the prosecutor's wand" to "transform an unreasonable probable cause determination into a reasonable one," Boyle may not "wave" the Code here to transform an unreasonable seizure into a reasonable one.  622 F.3d at 256.

Even assuming arguendo that an officer who relies on the Abandoned Vehicle Code is presumptively entitled to qualified immunity from a Fourth and Fourteenth Amendment claim premised on an unreasonable seizure, this presumption and the one in the definition of an abandoned vehicle have been rebutted by Foster with facts surrounding the seizures.  Consequently, at the summary judgment stage, Foster has raised a genuine issue of material fact on both prongs of the qualified immunity test in regard to Boyle.

## 2.    Section 1983 Claim Against City of Philadelphia

The City of Philadelphia moves for summary judgment on Foster's § 1983 claim alleged in Count One, arguing that even if Boyle's actions constituted a violation of Foster's rights under the Fourth Amendment, the United States Supreme Court decision in <u>Monell v. New York City Dep't of Social Services</u> shields the City from liability.  436 U.S. 658 (1978).

Under <u>Monell</u>, municipalities may be liable under § 1983 only if the alleged unconstitutional act stems from the implementation of that body's official policy or custom and not solely by operation of the doctrine of respondeat superior.  436 U.S. at 690-95.  A formal "policy" for <u>Monell</u> purposes is established when a "decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting <u>Pembaur v. City</u>

of Cincinnati, 475 U.S. 469, 481 (1986)).  Absent such a formal policy, municipal liability can be

established by custom.  A custom, even if not explicitly authorized by the municipality, must be

"so permanent and well settled as to virtually constitute law" in order for § 1983 liability to

attach.  Andrews, 895 F.2d at 1480 (citing Monell, 436 U.S. at 690).  "Proof of a single incident

of unconstitutional activity is not sufficient to impose liability under Monell . . . ."  City of

Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  In addition to pinpointing a tangible city

policy or custom, a plaintiff must prove a direct causal link between that policy or custom and

the alleged constitutional violation.  City of Canton v. Harris, 489 U.S. 378, 385 (1989).

Ultimately, whether a policy or custom caused a deprivation of a plaintiff's rights is a question of

fact for the jury.  Andrews, 895 F.2d at 1481 (citing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701

(1989)).

    Here, viewing the evidence in the light most favorable to Foster as the nonmoving party, no

reasonable jury could conclude on the facts presented that a policy or custom of the City of

Philadelphia provided a direct causal link to Fourth and Fourteenth Amendment violations

arising from Officer Boyle's actions.  Foster does not provide evidence of any ongoing policy or

custom that would permit the systematic towing of thirty-five vehicles from a private business

establishment.  In fact, Foster's brief highlights evidence showing that the May 16 and May 23

towings were an aberration from the typical towing operation, indicating that no seizure of this

magnitude from private premises had ever occurred before under the guise of the Abandoned

Vehicle Code:

> Lieutenant Long told Foster that he was shocked about the bizarre operation of
> towing the vehicles by the Neighborhood Services Unit and that Internal Affairs
> would look into it.
>                                          ***

On May 26, 2011, Lieutenant Long sent an email to Captain Desher, which read in relevant part:

Captain Desher,

Thank you for taking my call today in reference to the assignment at 86 West Johnson St.  This is a rather unique situation and I hope that your contacting the evicted tenant, Jim Foster, will help minimize the need for a formal investigation and IA

                                        ***

Officer Boyle, who has also towed thousands of cars in his position at NSU, could not name another instance in which vehicles were towed from a closed garage or an automotive business.

                                        ***

[C]ivilian administrator Mary Bibbo, who has worked for NSU for fourteen (14) years, acknowledged that she has never heard of another instance in which such a high volume of vehicles was towed from a private garage.

(Doc No. 100 ¶¶ 53, 58-61.)

Accordingly, the seizures here are more akin to a "single incident of unconstitutional activity" which is not sufficient to impose liability under Monell.  See Tuttle, 471 U.S. at 823-24. Moreover, the unconstitutional activity of Boyle cannot be attributable to the City as his employer under the doctrine of respondeat superior, but must be sourced from a City policy or custom, which, as noted, has not been shown here.

In sum, the facts presented by Foster as the nonmoving party do not raise a genuine issue of material fact that the seizure of the vehicle and the parts was the result of a policy or custom of the City of Philadelphia.  Consequently, the Motion for Summary Judgment of the City of Philadelphia on Count One will be granted, and the City will be dismissed as a party on the § 1983 claim.

31

### 3.    Section 1983 Claim Against Jefferson

Foster has also made a claim in Count One against Alfred Jefferson under § 1983, alleging that he acted under color of state law through joint participation with Officer Boyle in the unlawful seizures before and during the May 16 and May 23, 2011 towings.[17]

Jefferson is a private citizen, not employed by the state.  A private actor can be considered a state actor under § 1983 in one of two ways. "The first category involves an activity that is significantly encouraged by the state or in which the state acts as a joint participant."  Boyer v. Mohring, 994 F. Supp. 2d 649, 657 (E.D. Pa. 2014) (citing Dickerson v. DeSimone, Inc., No. 09-1551, 2011 WL 3273228, at *2 (E.D. Pa. Aug. 1, 2011)).  "The second category of cases involves an actor that is controlled by the state, performs a function delegated by the state, or is entwined with government policies of management."  Id.; see also Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1265 (1994) (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)) ("[A] private actor is subject to liability under section 1983 . . . . because he has acted together with or has obtained significant aid from state officials, or that his conduct is otherwise chargeable to the state." ).

In this case, only the joint participation or action standard is applicable because on April 9, 2013, the Honorable Petrese Tucker to whom this case was originally assigned, held in an Opinion denying the Motions to Dismiss of Jefferson and Century Motors, that Foster only alleged enough evidence in the Amended Complaint to support the joint action theory.  (Doc.

---

[17] Jefferson preliminarily argues that the removal of the vehicles, in of itself, is not a seizure within the meaning of the Fourth Amendment.  (Doc. No. 87 at 5.)  A "seizure" occurs under the Fourth Amendment when there is some meaningful interference with an individual's possessory interest in that property.  Soldal v. Cook County, 506 U.S. 56, 61 (1992).  Here, Foster has alleged sufficient facts in his Omnibus Response to Defendants' Motions for Summary Judgment to prove that there was such interference with vehicles in his possession and a resultant seizure.  (Doc. No. 100.)

No. 25.)  Therefore, this Court will limit its analysis of § 1983 liability against Jefferson to the "joint action" theory.

Under the "joint action" standard, "[i]n order to establish the requisite level of joint participation and collaboration, a plaintiff must aver the existence of a 'pre-arranged plan [between the police and a private entity] by which the police substituted the judgment of [a] private part[y] for their own official authority.'"  Boyer, 994 F. Supp. 2d at 657 (citing Cruz v. Donnelly, 727 F.2d 79, 80 (3d Cir. 1984)); see also Cahill v. Live Nation, 512 F. App'x 227, 230-31 (3d Cir. 2013).

Additionally,  joint action cannot be one-sided: "[M]erely calling the police, furnishing information to the police, or communicating with a state official does not rise to the level of joint action necessary to transform a private entity into a state actor."  Cooper v. Muldoon, No. 05-4780, 2006 WL 1117870, at *2 (E.D. Pa. Apr. 26, 2006).

### i.        Jefferson Is a State Actor

#### a.        Pre-Arranged Plan Between Jefferson and Boyle

Foster claims that Jefferson acted under color of state law under the joint action theory by willfully participating in a pre-arranged plan with Boyle during the May 16 and May 23 towings. In his Motion for Summary Judgment, Jefferson argues that no pre-arranged plan existed because Jefferson merely called the police on PennDOT's recommendation and had no prior contact with the police regarding Foster's eviction prior to his interaction with Boyle.  (Doc. No. 87 at 12; Jefferson Dep. at 64, 69.)  Jefferson argues that his interaction with Boyle was akin to calling or furnishing information to the police, activities that do not support a § 1983 claim under the joint action test.

Foster argues to the contrary, and the Court agrees, that there is evidence that the relationship between Jefferson and Boyle consisted of more than just one phone call: "Jefferson and Boyle

collaborated on a complex, multi-day towing operation that was unprecedented in volume for Officer Boyle . . . ." (Doc. No. 100 at 18.)  Foster has presented facts showing that "[t]he collaboration between Boyle and Jefferson consisted of at least three in-person meetings, the completion of the PennDOT MV952-PP forms, several telephone conversations and two full-day towing sessions, which involved the towing of a total of [thirty-five] vehicles." (Doc. No. 100 at 18; Boyle Dep. at 26-32, 37-40, 72-73.)  This activity goes well beyond the factual activity in the cases cited by Defendants in which a pre-arranged plan was not formed.  Viewing this evidence in the light most favorable to Foster, a genuine issue of material fact exists as to whether Jefferson engaged in a pre-arranged plan with Boyle.

### b.      Substitution of Judgment

Jefferson also argues that Boyle exercised his exclusive authority and judgment in making the decision to tow the vehicles because he conducted his own independent investigation, verified that Jefferson owned the property, and decided that the vehicles were considered abandoned under Pennsylvania law. (Doc. No. 87 at 15; Boyle Dep. at 33, 42, 49.)

Foster argues, however, that the evidence shows Boyle did not rely on his own personal judgment in determining that the vehicles were "abandoned" under the Code, but also relied on Jefferson's judgment.  Foster has shown that Jefferson gave Boyle the roadmap to follow and in effect guided him through the seizure process by giving him (1) unfettered access to the property; (2) providing Boyle with the Writ of Possession; (3) verifying on the PennDOT MV-952PP forms that the vehicles were abandoned; and (4) encouraging him to remove the vehicles from the garage.  (See Doc. No. 87-1 at ¶¶ 31, 35, 48-52.)  In addition, Boyle testified that he noticed a business license on the wall, an engine hoist, a jack, automobiles, and parts in the garage on May 16, 2011, which would have put him on notice that the vehicles were not abandoned.  (Doc. No. 100 at 18; Boyle Dep. at 38-39.)  Boyle also testified that Foster

34

personally informed him that the cars were not abandoned.  (Boyle Dep. at 41-43.)  Despite the evidence showing that the vehicles were not abandoned, Boyle removed the vehicles because the owner of the property wanted them removed. (Doc. No. 100 at 18; Boyle Dep. at 62).[18] Accordingly, there is a genuine issue of material fact as to whether Boyle exercised his own independent judgment or in fact substituted Jefferson's judgment for his own.

Based on the foregoing, and viewing the evidence in the light most favorable to Foster, there is sufficient evidence for a reasonable jury to find that Jefferson was a "joint participant," and therefore a state actor.  Moreover, the Court has already found that the manner in which the vehicles were seized rises to the level of a violation of the Fourth and Fourteenth Amendments at the summary judgment stage.  Thus, Jefferson's Motion for Summary Judgment on the § 1983 claim in Count One will be denied.

### ii.        Jefferson Is Not Entitled to Qualified Immunity

As a state actor, Jefferson is not entitled to receive the benefit of the qualified immunity defense.

In Kauffman v. Pennsylvania Society for the Prevention of Cruelty to Animals, the Honorable Stuart Dalzell, a judge of this Court, set forth the applicable legal standard to determine whether a private defendant is entitled to qualified immunity.  766 F. Supp. 2d 555 (E.D. Pa. 2011).  In Kauffman, the private defendants were employees of Pennsylvania Society for the Prevention of Cruelty to Animals ("PSPCA"), a private non-profit corporation.  Id.  The employees were sued under § 1983 for the seizure of animals from a private residence pursuant

---

[18]  Additionally, Foster produced evidence showing Jefferson's animus towards Foster and his motivation to work with Boyle in removing the vehicles from the garage.  The May 16 seizure occurred less than a week after Foster published an editorial "Trouble in Tascoland," criticizing Philadelphia Councilwoman Marian Tasco, who was a personal friend of Jefferson.

to a search warrant.  Id.  In his Opinion, Judge Dalzell noted the applicable law, which is quoted

here at length, as follows:

> The Supreme Court in recent times has decided two cases involving the assertion of the qualified immunity defense by private defendants, Wyatt v. Cole, 504 U.S. 158, (1992), and Richardson v. McKnight, 521 U.S. 399 (1997).  In Wyatt, the Court examined "whether qualified immunity, as enunciated in Harlow [v. Fitzgerald, 457 U.S. 800 (1982)] is available for private defendants faced with § 1983 liability for invoking a state replevin, garnishment, or attachment statute," and found "[t]hat answer is no."  504 U.S. at 168-69.  In Richardson, it concluded that "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case."  521 U.S. at 412.  While Wyatt bluntly stated that the rationales supporting qualified immunity "are not transferable to private parties," 504 U.S. at 168, Richardson explained that "Wyatt did not consider its answer to the question before it as one applicable to *all* private individuals." 521 U.S. at 404 (emphasis in original).  To determine whether PSPCA officers may be entitled to qualified immunity from suit under § 1983 when they assist in law enforcement, we must follow Wyatt 's teaching that:

> > [W]e have accorded certain government officials either absolute or qualified immunity from suit if the tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine.  If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 187—§ 1 of which is codified at 42 U.S.C. § 1983—we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law. Additionally, irrespective of the common law support, we will not recognize an immunity available at common law if § 1983's history or purpose counsel against applying it in § 1983 actions.

> 504 U.S. at 164 (internal quotation marks and citations omitted).

> It seems clear under Wyatt that whether qualified immunity for particular defendants existed at common law in 1871 is the threshold inquiry that must take place before any investigation of whether such immunity would comport with § 1983's history or purpose.  The statement in Richardson that we must "look both to history *and* to the purposes that underlie government employee immunity in order to find the answer," 521 U.S. at 404 (emphasis added), and Richardson's exploration of the immunity doctrine's purposes after finding "no conclusive evidence of a historical tradition of immunity," id. at 407, are not to the contrary. Richardson quoted language from Wyatt suggesting that both common law support and consonance with § 1983's purposes are prerequisites for qualified

immunity: "[T]his Court has nonetheless accorded immunity where a 'tradition of immunity was so firmly rooted in the common law *and* was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine.'" Id. at 403 (emphasis added) (quoting Wyatt, 504 U.S. at 164 (quoting Owen v. City of Independence, 445 U.S. 622, 627 (1980) (quoting Pierson v. Ray, 386 U.S. 547, 555 (1967)))). And Richardson's examination of both the common law and the immunity's purposes may be ascribed to the Court's thoroughness and not to any intent to revise Wyatt 's test.

Kauffman, 766 F. Supp. 2d at 563-64.

Here, nothing rooted in the common law would support Jefferson's claim to qualified immunity. Insofar as the purposes that underlie governmental employee immunity, Richardson noted that there are essentially three reasons behind the doctrine of qualified immunity. 521 U.S. at 409. First, the most important concern is that a government official will act with unwarranted timidity out of the fear of being sued if he is not afforded qualified immunity. Id. Second, there is a need to ensure that "talented candidates" in the private sector hired to support the state in performing an official function are not "deterred by the threat of damages suits from entering public service." Id. at 411. Third, a lawsuit may distract public employees from their duties. Id.

These policy concerns do not apply at all to a private individual like Jefferson who, in this case, used the Police Department to further his own private interests in having vehicles removed from his private property. Fear of suit was his least concern because as a private owner of a garage leased to a business establishment, he would or should have comprehensive insurance coverage for his actions. Moreover, talented individuals would not be deterred from governmental service based on the lawsuit filed against Jefferson here. Finally, the concern that a lawsuit may distract a public employee from his duties does not apply here. Even if it would create a distraction, in Richardson, the Court held "the risk of distraction" alone cannot be sufficient grounds for immunity." Id. Given the unique situation here involving Jefferson, no

purpose for granting qualified immunity as discussed in <u>Richardson</u> would be served in affording Jefferson the defense of qualified immunity.

Although Jefferson does not rely upon a more recent United States Supreme Court decision, <u>Filarsky v. Delia</u>, in which the Court held that a private attorney employed part-time by a governmental entity was entitled to qualified immunity under limited circumstances, a discussion of <u>Filarksy</u> is warranted.[19]  132 S. Ct. 1657, 1666 (2012).  In this case, a municipality hired a private attorney on a part-time basis to conduct an interview and investigation of a municipal employee suspected of abusing disability leave.  <u>Id.</u> at 1660-61.  The investigation culminated in a search of the suspected employee's home, leading the employee to sue the attorney and other municipal officials under § 1983.  <u>Id.</u> at 1661.  The Supreme Court found that the attorney should be granted qualified immunity because there was no dispute that historically, qualified immunity was available for the sort of investigative activities undertaken by the attorney.  <u>Id.</u> at 1662.  In its analysis, the court in <u>Filarsky</u> looked to general principles of tort immunities and defenses available at common law, and exhaustively explored the history since the inception of § 1983 in 1871 of private individuals carrying out public functions and being privately sued simultaneously.  <u>Id.</u>  The Court concluded that there was a history, albeit a "varied" one, of "individuals receiving immunity for actions taken while engaged in public service on a temporary or occasional basis."  <u>Id.</u> at 1665.  Once the Court established a historical foundation for qualified immunity for investigative activity, it further held that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis."  <u>Id.</u>  Most importantly, the Supreme Court in

---

[19] <u>Filarsky</u> distinguishes, but does not overrule, the holdings in <u>Wyatt</u> and <u>Richardson</u>.  132 S. Ct. 1657, 1666-67.

<u>Filarsky</u> reaffirmed the reasoning and vitality of <u>Wyatt</u> and <u>Richardson</u>, the two decisions cited by Judge Dalzell in his analysis in <u>Kauffman.</u> <u>See generally id.</u> at 1666-68.

Jefferson's situation is very different from the attorney's situation in <u>Filarsky</u> because Jefferson was not retained by the City in any manner to promote the public good. The Court in <u>Filarksy</u>, referring to <u>Wyatt</u>, recognized this situation, and noted the distinction between a private citizen engaging with the state to enhance the "public good" and private citizens engaging with the state to "pursue[] purely private ends." 132 S. Ct. at 1667 ("We explained [in <u>Wyatt</u>] that the reasons underlying recognition of qualified immunity did not support its extension to individuals who had no connection to government and pursued purely private ends."). Here, there is no question that Jefferson, in his actions with Boyle, was pursuing a purely private end: the removal of Foster's vehicles from his private property.

One last matter must be discussed with respect to qualified immunity:

> In <u>Richardson</u>, the Supreme Court cautioned that "we have answered the immunity question narrowly, in the context in which it arose . . . . The case does not involve a private individual briefly associated with a government body, serving as an adjunct to government in an essential government activity, or acting under close official supervision."

<u>Kauffman</u>, 766 F. Supp. 2d at 565 (quoting <u>Richardson</u>, 521 U.S. at 413).

In this case, as discussed above, the facts show that Jefferson's conduct does not fall under the three potential categories from which qualified immunity may arise as set forth in <u>Richardson</u>. Not only was Jefferson's conduct purely for private purposes and not the greater societal good, his interaction with the government was not fleeting. Jefferson initially contacted NSU, met Boyle in person prior to the May 16 and 23 towings, provided Boyle with the Writ of Possession/Eviction as proof of ownership, granted him access to the garage on May 16 and 23, and signed the PennDOT MV-925PP forms with Boyle. Such conduct occurred over a sufficient

period of time and involved considerable interaction with NSU and Boyle.  It was not a brief association with a government body.

Furthermore, this case involves the seizure of allegedly abandoned cars from a private garage.  This is not an "essential governmental activity."  Jefferson also did not act under close official supervision.  The seizures were done at his initiative, and he did not engage in any conduct that was "closely" supervised by Boyle.

### a.    Good Faith Affirmative Defense

Despite Jefferson not being entitled to qualified immunity, he is entitled to assert good faith as an affirmative defense at trial.  The Supreme Court in Wyatt opened the door to this defense, holding that "we do not foreclose the possibility that private defendants faced with § 1983 liability under Lugar v. Edmonson Oil Co., 457 U.S. 922 (1982) could be entitled to an affirmative defense based on good faith and/or probable cause . . . ."  504 U.S. at 169.  On remand from Wyatt, the Fifth Circuit held that "[p]rivate defendants should not be liable under § 1983 absent a showing of malice and evidence that they either knew or should have known of the statute's constitutional infirmity."  Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1276 (3d Cir. 1994) (citing Wyatt v. Cole, 994 F.3d 1113, 1120 (5th Cir.), cert. denied, 510 U.S. 977 (1993)) (internal quotation marks omitted).  The Third Circuit has adopted this affirmative defense, and defined "malice" for purposes of this defense to mean a "subjective appreciation" by the private state actor that his act infringed on the plaintiff's constitutional rights.  Id.  The court held that: "'good faith' gives state actors a defense that depends on their subjective state of mind, rather than the more demanding objective standard of reasonable belief that governs qualified immunity."  Id. at 1277.

Jefferson's subjective state of mind is for a jury to determine and cannot be disposed of on summary judgment.  Wolfe v. Horn, 130 F. Supp. 2d 648, 659 (E.D. Pa. 2001).  A genuine issue of material fact exists as to whether Jefferson believed the cars were abandoned.  His resort to NSU to remove the cars from his private garage knowing that Foster was periodically removing them to return the cars to their owners raises another factual issue as to whether he was acting in good faith.  For this reason, the good faith defense is not a basis for summary judgment on Count One as to Jefferson.

### 4.      Section 1983 Claim Against Century Motors

#### i.      Century Motors Is a State Actor

Century Motors is a state actor for § 1983 purposes by virtue of maintaining an ongoing salvor relationship and contract with the City of Philadelphia.  Under this contract, the City would provide Century Motors with towing assignments and Century Motors would be responsible for towing the vehicles in accordance with state law.

In another case, a salvor was held to be a state actor under § 1983 under the same circumstances.  In Mays v. Scranton City Police Department, a private tower acting pursuant to the Abandoned Vehicles Code claimed that he could not be held liable for damages under § 1983.  The Court disagreed, holding:

> It is precisely because [the salvor] removed the car pursuant to state law, however, that exposes him to liability under 42 U.S.C. § 1983.  As the Court of Appeals for the Ninth Circuit in Stypmann v. City of San Francisco, 557 F.2d at 1341-42 noted:
>
> > The towing company detains the vehicle and asserts the lien for towing and storage charges pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws.  Thus, the private towing company is a 'willful participant' in a joint activity with the State or its agents, and there is a 'sufficiently close nexus between the State and the challenged action of the (towing company) so that the action of the latter may be fairly treated as that of the State itself . . . .

41

> In sum [the salvor] clearly acted 'under color of state law,' and because of the governmental involvement surrounding the tow and detention of the vehicle, [the salvor's] conduct is properly attributable to the Commonwealth as 'state action.'

503 F. Supp. 1255, 1264 (M.D. Pa. 1980) (citations omitted) (footnotes omitted).

Even towing companies, which have less responsibility than salvors under Pennsylvania law, have been held to be state actors, albeit in other jurisdictions. Tarantino v. Syputo, No. 03-03450, 2006 WL 1530030, at *7 (N.D. Cal. June 2, 2006) ("[T]owing companies are deemed to be state actors because they tow vehicles in response to orders by law enforcement officials . . . ."; Goichman v. Rhueban Motors, Inc., 682 F.2d 1320, 1322 (9th Cir. 1982) ("[A] private towing company acting at the behest of a police officer and pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws, acts under color of state law for purposes of section 1983."). Since salvors engage in more conduct than towing companies under the Abandoned Vehicle Code, it follows inexorably that a salvor like Century Motors is a state actor.

### ii.     Century Motors Is Not Entitled to Qualified Immunity

Century Motors argues that even if it is deemed to be a state actor, it is entitled to the qualified immunity defense. (Doc. No. 86 at 65.) However, the same analysis that was used in denying Jefferson qualified immunity applies to Century Motors. As the Supreme Court said in Richardson, Wyatt instructs us to look both to the history and the purposes that underlie governmental employee immunity in order to find an answer to the question of whether the private party is entitled to qualified immunity. Richardson, 521 U.S. at 404; Wyatt, 504 U.S. at 164.

History does not reveal a "firmly rooted tradition of immunity" applicable to salvors. Century Motors has not supplied this Court with any case in which a salvor has been granted qualified immunity and none has been found by this Court.

Additionally, none of the three policy considerations enumerated in <u>Richardson</u> are undermined by denying Century Motors immunity in this case.  <u>See</u> <u>Richardson</u>, 521 U.S. at 411 (listing unwarranted timidity from suit, the need to ensure that private "talented candidates" are drawn to provide services to the state, and the threat of a lawsuit distracting public employees from their duties as policy considerations in determining whether qualified immunity is appropriate).

First, unwarranted timidity from suit is not a concern here.  As noted in <u>Richardson</u> in regard to guards employed by a privately-run prison facility, "marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance."  521 U.S. at 410.  Similar reasoning applies to Century Motors.  Century is a private company that voluntarily agreed to sign up as a salvor, and engages in a business subject to competitive market pressures.  In addition to its repair business, Century Motors receives income as a salvor under the Abandoned Vehicle Code.  The City of Philadelphia does not pay salvors directly.  Instead, salvors like Century earn money from towing and storage fees collected from private parties and the disposition of unclaimed vehicles or parts.  The fact that salvors receive assignments from NSU does not undermine the fact that they are still private companies subject to competitive market pressures in their industry. Moreover, as demonstrated by the email from Cray to Bibbo inquiring about paperwork reflecting the value of the seized vehicles, it is clear that Century is driven as a salvor by the

conditions in the marketplace involving the disposition of abandoned vehicles and car parts rather than by any fear of a lawsuit.

Second, denying Century Motors immunity would not undermine the "need to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." Id. at 411 (citing Wyatt, 504 U.S. at 167). Like the private prison guards in Richardson, Century Motors is a private company that is organized to perform at a profit. It would be covered by comprehensive business insurance similar to Jefferson. It is on notice that it must maintain insurance to protect itself in case of a lawsuit because the City of Philadelphia requires in its contract with Century that it maintain "in full force and effect, insurance coverage which will satisfactorily insure [Century Motors] and [the] City against claims and liabilities which could arise out of the Salvor Agreement with the City." (Doc. No. 84, Ex. R.) Richardson held that such insurance policies taken out by private entities that contract with the government "increase[] the likelihood of employee indemnification and to that extent reduces the employment-discouraging fear of unwarranted liability potential applicants face." Id. at 410-11. Thus, "talented candidates" or companies comparable to Century Motors would not be deterred from engaging in business as a salvor.

Third, the final Richardson policy consideration is the fear that without the benefit of qualified immunity, lawsuits may distract employees from their duties. Id. at 411. As noted previously, Richardson held that "the risk of 'distraction' alone cannot be sufficient grounds for immunity. Since Century Motors would have indemnity insurance, it is unlikely that its employees would be distracted from their duties.

Century Motors relies on Filarsky v. Delia to support its claim that it should have the protection of qualified immunity. (Doc. No. 86 at 65); 132 S. Ct. at 1657. Again, the facts in

44

<u>Filarsky</u> are very different than the facts here involving Century Motors.  For the reasons that <u>Filarsky</u> does not support Jefferson's claim of qualified immunity, it does not support Century Motors' claim.

Finally, Century Motors' situation here does not fall within the cautionary language in <u>Richardson</u>, where the Court noted that the case did not involve a private individual briefly associated with a governmental body, serving as an adjunct to government in an essential government activity, or acting under close official supervision.  521 U.S. at 409-12.  Century's interaction with NSU was not brief.  It operated under a contract with the City and towed cars and took parts that were pointed out by Officer Boyle.  It expended considerable time storing the vehicles and parts, and returning cars to their owners.  Thereafter, paperwork on the results of Century's activity was sent to NSU.  Such actions by Century are not brief but protracted.

Moreover, similar to Jefferson, Century Motors is not acting as an adjunct to government in an essential government activity.  As noted above, the seizure of allegedly abandoned cars from a private garage is not an "essential government activity."

The third category, whether Century acted under close supervision, on its face, may seem to favor Century.  Under close analysis though, it does not.  While Century operates in a regulated environment with a contract with the City of Philadelphia, the regulation is mainly to insure that Century is qualified to act as a salvor and reports its activity to ensure compliance with the law.  It is not paid by the City and derives its profits from transactions with private individuals or entities.  The only alleged supervision it receives is the assignment where to tow cars from and what cars to tow.  When it does so, and later disposes of the vehicles, it is not doing so under close official supervision.  It is doing so as a private company out to make a profit.  The fact that it must comply with the terms of the contract with the City and the provisions of the Abandoned

Vehicle Code, similar to the legal requirements imposed on so many other organizations that do business with a municipality in a regulated environment, does not mean it operates under "close" supervision by government employees in its operations.  In fact, Cray, Century's employee, coordinated the towing on Century's behalf and Century dealt with owners of the vehicles seeking their return on its own.  The fact that at NSU's direction Century did not charge the owners a fee for towing or storage does not convert the relationship to "close" supervision.  Accordingly, Century Motors is not entitled to qualified immunity and its Motion for Summary Judgment on Count One will be denied.

### a.    Good Faith Affirmative Defense

Although Century Motors is not entitled to qualified immunity, it may assert a good faith affirmative defense at trial similar to Jefferson.  The determination of Century Motors' subjective state of mind is a question of credibility for the jury.  Wolfe, 130 F. Supp. 2d at 659.  Again, Foster has raised a genuine issue of material fact as to Century Motors' good faith.  As discussed infra, a genuine issue of material fact exists as to whether Century Motors conspired with NSU to seize the cars and parts improperly to further its own parts business.  See section V.D, infra.  Thus, as with Jefferson, the good faith defense is not a basis for summary judgment for Century Motors.

### B.    Abuse of Process Claims Against City Defendants, Jefferson, and Century Motors

City Defendants, Jefferson, and Century Motors move for summary judgment on Count Two of the Amended Complaint alleging the state law claim of abuse of process.  Abuse of process is a tort "defined as the use of legal process against another primarily to accomplish a purpose for which it is not designed."  Lerner v. Lerner, 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008).  In order to prevail on such a claim, Plaintiff must show that "defendant (1) used a legal process against

the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed,  and (3) harm has been caused to the plaintiff."  Id.

In Pennsylvania, courts interpret the meaning of "legal process" referred to in the first prong of this tort "broadly, and [it] encompasses the entire range of procedures *incident* to the litigation process . . . . including discovery proceedings, the noticing of depositions and the issuing of subpoenas."  Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 310 (3d Cir. 2003) (citations omitted) (emphasis added).

As to the second prong, that the process was used primarily to accomplish a purpose for which it was not designed, the court in Lerner noted: "[I]t is immaterial that the process was properly issued, that it was obtained in the course of proceedings that were brought with probable cause and for a proper purpose, or even that the proceedings terminated in favor of the person instituting or initiating them.  The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed . . . ."  Lerner, 954 A.2d at 1238-39.

### 1.    Abuse of Process Claim Against Jefferson

Viewing evidence in the light most favorable to Foster, he has shown that Jefferson committed the tort of abuse of process.  The process that Jefferson abused was the Writ of Possession he obtained on January 21, 2011.

In early February 2011, armed with the writ, Jefferson had a Sheriff evict Foster. Thereafter, while the door was padlocked, Jefferson and Foster had an arrangement to allow Foster to remove vehicles when Foster contacted Jefferson.  Rather than continue this arrangement, Jefferson misused the writ by contacting NSU and convincing its representative, Officer Boyle, that the vehicles were abandoned knowing that this was not the case.  Thus, at the

summary judgment stage, Foster has shown that Jefferson used legal process or the writ against Foster primarily to accomplish a purpose for which it was not designed and caused Foster harm stemming from the seizure of the vehicles.

### 2.      Abuse of Process Claims Against City Defendants

Foster also claims that the City of Philadelphia through NSU and Officer Boyle committed the tort of abuse of process.  Foster, however, has not identified any specific legal process that was abused.

Neither Boyle nor the City of Philadelphia resorted to legal process in seizing the vehicles. They were not involved with obtaining the Writ of Possession nor with any procedure incident to the litigation process.  Here, Boyle and NSU allegedly relied only on the Pennsylvania Abandoned Vehicles Code in seizing the vehicles.  The Code does not require that litigation commence before a seizure takes place.

Accordingly, since Foster has not come forward with any evidence showing a genuine issue of material fact, the abuse of process claim as alleged in Count Two will be dismissed as to the City Defendants.

### 3.      Abuse of Process Claim Against Century Motors

For the same reason that the City Defendants are not liable for abuse of process, Century Motors is not liable.  There is no evidence that Century Motors engaged in any conduct incident to litigation.  Consequently, the abuse of process claim as alleged in Count Two against them will be dismissed.

### C.      Conversion Claims Against City Defendants, Jefferson, and Century Motors

In Count Three, Foster alleges state law conversion claims against each Defendant for the May 16 and 23, 2011 towings based on the physical seizure, transportation, and subsequent damage to the vehicles and loss of parts.

48

Conversion is "an act of willful interference with a chattel, done without lawful justification, by which any person entitled thereto is deprived of use and possession."  Norriton E. Realty Corp. v. Central-Penn Nat'l Bank, 254 A.2d 637, 638 (Pa. 1969) (citations omitted).  Conversion can take one of four forms:

> (1)    Acquiring possession of the goods, with an intent to assert a right to them which is in fact adverse to that of the owner;
>
> (2)    Transferring the goods in a manner which deprives the owner of control;
>
> (3)    Unreasonably withholding possession from one who has the right to it; or
>
> (4)    Seriously damaging or misusing the chattel in defiance of the owner's rights.

Id.  The intent required is not of conscious wrongdoing, but merely to exercise control over goods which is inconsistent with the plaintiff's rights. Id.

Here, Foster has raised a genuine issue of material fact as to whether each of the remaining Defendants, without lawful justification, willfully interfered with his property.  Defendants argue that there was lawful justification, but this claim is one that may be a defense at trial.  It does not overcome the genuine issue of material fact that Foster has raised at the motion for summary judgment stage.

### 1.    Conversion Claim Against Boyle

Foster claims that by seizing the vehicles, Boyle enabled the transfer of the vehicles and parts while simultaneously using his authority to deny Foster access to them.  Taking the facts in the light most favorable to him, Foster has raised a genuine issue of material fact regarding whether Boyle transferred the vehicles, and if that transfer deprived Foster of control over them.  These are the elements of conversion.

49

Boyle argues in the alternative, however, that even if a reasonable jury could hold him liable for conversion, he would be entitled to immunity under the Pennsylvania Political Subdivision Tort Claims Act ("the Act"), 42 Pa.C.S.A. §§ 8541-64.  The Act provides municipalities with general immunity for tort liability.  Boyle claims that as a City employee, he is covered by, and should receive, the benefit of the immunity afforded to municipalities and its employees.  The Act provides in part:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any person.

42 Pa.C.S.A. § 8541.

The Act does provide for a limited waiver of its general immunity in the following circumstances:

> (a) *Liability imposed.*--A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):
>
> (1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and
>
> (2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). *As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.*
>
> (b) *Acts which may impose liability.*--The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:

> (1) *Vehicle liability . . .*;
> (2) *Care, custody or control of personal property . . .*;
> (3) *Real property . . .*;
> (4) *Trees, traffic controls and street lighting . . .*;
> (5) *Utility service facilities . . .*;
> (6) *Streets . . .*;
> (7) *Sidewalks . . .*;
> (8) *Care, custody or control of animals . . .*;

42 Pa.C.S.A. § 8542 (emphasis added).

The eight exceptions enumerated above should be narrowly interpreted. <u>Lockwood v. City of Pittsburgh</u>, 751 A.2d 1136, 1139 (Pa. 1988) ("Because of the clear intent to insulate government from exposure to tort liability, the exceptions to immunity are to be strictly construed.").

Generally, an individual municipal employee is liable to the degree of his employer's liability:

> An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter.

42 Pa.C.S.A. § 8545.

As noted, however, there is an exception to this protection if the employee's actions causing the injury constitute a crime, actual fraud, actual malice, or willful misconduct:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined *that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct*, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

<u>Id.</u> § 8550 (emphasis added).

Willful misconduct has been defined as conduct "which the perpetrator recognized was misconduct and which was carried out with the intention of achieving exactly that wrongful purpose." In re City of Philadelphia Litigation, 938 F. Supp. 1264, 1271 (E.D. Pa. 1996), aff'd 158 F.3d 723 (3d Cir. 1998). Put simply, "the term 'willful misconduct' is synonymous with the term 'intentional tort.'" Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006) (internal quotation marks omitted). "The existence of willful misconduct is a question of law that 'must be judicially determined.'" Kuzel v. Krause, 658 A.2d 856, 860 (Pa. Commw. Ct. 1995) (quoting Pa.C.S.A. § 8550)).

Boyle's conduct could be considered willful misconduct when viewing the facts in the light most favorable to Foster. Boyle's control and transfer of the vehicles amounted to misconduct because he ignored the objective evidence described above that the vehicles were not abandoned. Furthermore, he turned a blind eye to the unique circumstances of this particular towing assignment in light of his professional experience at NSU. He admitted that while he had been involved in over a thousand tows, he had never towed this number of vehicles from a private garage. Moreover, he took parts from the garage without inventorying them. This evidence lends credence to Foster's claims that Boyle acted in this way for the purpose of benefitting both Jefferson and Century Motors. Thus, his actions deprived Foster of control, use, and possession of the vehicles, and under the facts here constitute conversion. Summary judgment on Count Three against Boyle will not be granted.

### 2. Conversion Claim Against City of Philadelphia

As noted above, the Pennsylvania Political Subdivision Tort Claims Act generally absolves local agencies and municipalities from liability:

> Except as otherwise provided in this subchapter, no local agency
> shall be liable for any damages on account of any injury to a

person or property caused by any act of the local agency or an
employee thereof or any other person.

42 Pa.C.S.A. § 8541.

Because Boyle's conduct, when viewed in the light most favorable to Foster, amounts to

willful misconduct, the conversion claim based on this misconduct as to him does not fall into

one of the eight narrow exceptions to municipal liability for acts of negligence laid out in § 8542

of the Act.  42 Pa.C.S.A § 8542.  But "[a]s for intentional torts, although municipal employees

themselves can be held liable for acts of crime, actual fraud, actual malice or willful misconduct,

the City cannot be held liable for an injury caused by the criminal, fraudulent, malicious, or

willful/intentional misconduct of the employee." Gallashaw v. City of Philadelphia, 774 F. Supp.

2d 713, 718 (E.D. Pa. 2011) (citations omitted) (internal quotation marks omitted).  Accordingly,

the City of Philadelphia will be dismissed as a defendant to the conversion claim alleged in

Count Three of the Amended Complaint.

### 3.        Conversion Claim Against Jefferson

A reasonable jury could find here that Jefferson's complicity with Boyle in the seizure of the

vehicles and parts in the possession of Foster renders him responsible for the tort of conversion

alleged in Count Three.  As noted previously, Jefferson instigated the seizure of the vehicles by

contacting NSU and providing Boyle with the means to seize the vehicles under the pretext of

the Abandoned Vehicles Code.  Jefferson's conduct in assisting Boyle resulted in the transfer of

the vehicles and concomitant loss of control over them by Boyle.  Therefore, summary judgment

will be denied for Jefferson as to Count Three.

### 4.        Conversion Claim Against Century Motors

A reasonable jury could also find, based on Foster's evidence, that Century Motors is liable

for the conversion of the vehicles and parts in the possession of Foster that Century towed from

86 West Johnson Street.  First, it is undisputed that they acquired possession of the vehicles and parts when they physically towed them to their place of business.  Moreover, as a salvage business, Century Motors may assert a right to the vehicles and parts that is adverse to the owner through the salvage process.  Second, towing the vehicles and parts involves a transfer, thereby depriving Foster of control over them.  Finally, Foster claims that there was damage to the towed vehicles in that Century Motors returned vehicles to third parties with parts missing.  (Doc. No. 100 at ¶ 79-80.)  These facts constitute sufficient evidence of conversion and present genuine issues of material fact for a jury to consider.  Thus, summary judgment on Count Three as to Century will be denied.

### D.   Civil Conspiracy Claims Against City Defendants, Jefferson, and Century Motors

Lastly, Foster claims that Jefferson and Century Motors conspired with NSU and Officer Boyle to deprive Foster of his property.  (Doc. No. 100 at 26.)

To establish the tort of civil conspiracy, Foster must show:

> (1)   [A] combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose;
>
> (2)   [A]n overt act done in pursuance of the common purpose; and
>
> (3)   [A]ctual legal damage.

Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. Ct. 2008).

Further, mere conclusions of law are not sufficient to support a cause of action for conspiracy.  See Clay v. Advanced Computer Applications, Inc., 536 A.2d 1375, 1382 (Pa. Super. Ct. 1988), rev'd on other grounds, 559 A.2d 917 (Pa. 1989).  "Proof of malice, i.e. an intent to injure, is an essential part of the conspiracy cause of action . . . ."  See e.g., Grose v. P & G Paper Prods., 866 A.2d 437, 440 (Pa. Super. Ct. 2005) (citing Thompson Coal Co. v. Pike

54

Coal Co., 412 A.2d 466, 472 (Pa. 1979)); Doltz v. Harris & Assocs., 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003).

Foster claims that the factual circumstances showing "joint action" among Jefferson, Boyle, the City of Philadelphia, and Century Motors constitute a sufficient evidentiary basis for the tort of civil conspiracy to survive summary judgment. The Court agrees in part. The City of Philadelphia cannot be held liable for the state law tort of civil conspiracy under the Political Subdivision Tort Claims Act. 42 Pa.C.S.A. §§ 8541-64.

Based upon the evidence presented in conjunction with the summary judgment motions, however, there is a genuine issue of material fact as to whether Boyle, Jefferson, and Century Motors engaged in a civil conspiracy. Viewing the facts discussed above in the light most favorable to Foster, a jury may reasonably conclude that these three Defendants combined with a common purpose to unlawfully deprive Foster of the cars and parts that he either owned or over which he had custody.

Additionally, the Pennsylvania Political Subdivision Tort Claims act cannot save Boyle from potential liability for conspiracy. Conspiracy is an intentional tort and willful misconduct triggers the exception to immunity for individual employees under the Act. Based on the evidence, Boyle has committed such misconduct.

The City of Philadelphia, however, will be dismissed as a defendant on the civil conspiracy claim alleged in Count Four for the same reasons discussed in the conversion claim in Count Three. Similar to conversion, civil conspiracy is an intentional tort that is not included in the list of eight exceptions to municipal liability enumerated in § 8542 of the Act. Moreover, the City cannot be held liable for Boyle's willful misconduct.

**VI.     CONCLUSION**

Based upon the foregoing, Jefferson's Motion for Summary Judgment will be denied in its entirety.  The City of Philadelphia's Motion for Summary Judgment will be granted in its entirety and the City is dismissed as a defendant in this case.  The Motions for Summary Judgment of Officer Boyle and Century Motors will be granted on Count Two only.  An appropriate Order follows.